IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

AM-LINER EAST, INC.,                    *

    Plaintiff,                          *

vs.                                     *        CASE NO. 4:07-CV-172 (CDL)

COLUMBUS WATER WORKS,                    *

    Defendant.                          *

_____

O R D E R

This action arises from a construction project which Plaintiff contracted to complete for Defendant.  Plaintiff claims that during the course of the project Plaintiff provided labor, materials, and equipment not contemplated by the original contract and that Defendant is obligated to pay for the additional work.  Defendant contends that the "additional work" was contemplated in the contract and that Plaintiff is not entitled to additional compensation. Presently pending before the Court are the following motions: Defendant's Motion for Summary Judgment (Doc. 36), Defendant's Motion to Strike Affidavits of Willett, Miles, Gould, Eaton, and Furr (Doc. 60), Defendant's Motion to Strike Affidavit of Giuliani (Doc. 61), and Defendant's Motion to Strike Plaintiff's Response to Defendant's Statement of Material Facts and Plaintiff's Statement of Additional Facts (Doc. 62).  For the reasons set forth below, Defendant's motion for summary judgment is granted as to Plaintiff's claims for additional access road costs and costs associated with delays related to Defendant's decision not to close the Columbus River Walk and

denied as to all other claims.  The Court did not consider any evidence that is not admissible,[1] so the Court finds that Defendant's motions to strike are moot.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment has the burden to show that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the summary judgment movant meets its burden, the burden shifts and the nonmoving party must produce evidence to show that there *is* a genuine issue of material fact.  *Id.* at 324.  The nonmoving party must "go beyond the pleadings," *id.,* and point the Court to "specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e)(2); *accord Celotex Corp.*, 477 U.S. at 324.

---

[1]Defendant's main argument in support of striking Plaintiff's Statements of Material Fact and the Willett, Miles, Gould, Eaton, and Furr affidavits is that they contain extrinsic evidence regarding terms of the contract at issue here. As discussed more fully below, the Court concludes that several key terms in the Contract are unclear and ambiguous. Furthermore, the affidavits contain relevant evidence on the circumstances surrounding Plaintiff's decisions to perform the work it contends was extra—evidence that is relevant to the questions whether the "extra" work was within the scope of the Contract and whether Defendant waived the formal change order process.  As to Defendant's argument that Plaintiff's statements of fact contain "numerous misstatements," Defendant did not point the Court to any evidence of misstatements.

The movant is entitled to summary judgment if, after construing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in favor of the nonmoving party, no genuine issues of material fact remain to be tried.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  It is not enough to have *some* alleged factual dispute; there must be a genuine issue of material fact to defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 247-48.  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for Plaintiff—there must be more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson*, 477 U.S. at 248.

FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Plaintiff reveals the following.

Plaintiff responded to Defendant's Request for Proposal ("RFP") for the rehabilitation of Defendant's river interceptor[2] and submitted a bid for $1,318,000.00 to perform the work identified in the RFP ("Project").  Plaintiff was awarded the Project contract in October of 2005.  Plaintiff contends that during the course of the Project,

---

[2]The river interceptor is a 72-inch pipe that intercepts the flow of sewage from several smaller diameter pipe lines flowing into the South Columbus Water Resources Facility.

3

Plaintiff provided labor, materials, and equipment that were not contemplated by the Contract or were required because the actual site conditions were different than those contemplated by the Contract. Plaintiff sought $683,809.12 in additional compensation for the following items: (1) junction box concrete repairs ($28,051.12); (2) additional sod installation ($2,526.48); (3) repairs to a ruptured manhole wall ($16,982.40); (4) cleaning and delay costs associated with holes in a 36" aerial sewer line ($30,710.30); (5) heavy cleaning and rock removal on the 72-inch interceptor ($77,996.08); (6) additional paving ($5,248.89); (7) additional bypass pumping and equipment ($312,379.89); (8) construction of an access road to the River Walk ($140,028.00); and (9) costs associated with delays related to the decision not to close the Columbus River Walk ($69,885.96). (Ex. 6 to Def.'s Mot. for Summ. J. [hereinafter Def.'s MSJ], Letter from Mel Willett to Steve Davis, Sept. 22, 2006; Ex. 70 to Pl.'s Resp. to Def.'s Mot. for Summ. J. [hereinafter Pl.'s Resp.], Letter from Mel Willett to Steve Davis, Aug. 1, 2007.)

Defendant approved or partially approved Plaintiff's claims for additional compensation for claims 1-6 and denied Plaintiff's claims for additional compensation as to claims 7-9. (Ex. 18 to Def.'s MSJ, Letter from Mike Stickley to Mel Willett, Nov. 22, 2006; Ex. 17 to Def.'s MSJ, Letter from CH2MHILL to Mel Willett, June 18, 2007.) Defendant has not yet paid Plaintiff for the claims it approved or partially approved. (*See* Def.'s Reply in Supp. of Def.'s MSJ 5

4

[hereinafter Def.'s Reply].)   In its Complaint, Plaintiff seeks the full amount claimed on all nine claims.   (*E.g.*, Compl. ¶ 20.) Defendant's Motion for Summary Judgment specifically addresses claims 7-9 but does not address claims 1-6.   Nonetheless, Defendant appears to contend that it is entitled to summary judgment on claims 1-6 because "Defendant is prepared to tender into the Registry of the Court the amounts that were approved for Claims 1-6 but not paid." (Def.'s Reply at 5.)   However, even if Defendant had paid (and not simply promised to pay) the approved amount, there is a difference between the *approved* amount and the *claimed* amount, and Defendant does not point to any evidence showing that there is no genuine issue of material fact as to the amount Defendant owes for claims 1-6. Accordingly, the Court concludes that Defendant has not met its summary judgment burden as to claims 1-6, and summary judgment is thus denied as to those claims.

The Court now turns to the factual background for claims 7-9, which are the claims for costs related to additional bypass pumping and equipment, delays in the decision regarding closure of the Columbus River Walk, and construction of an access road.

**1.    General Contract Requirements**

Under the Contract, Plaintiff was required to be "informed fully of the conditions relating to the construction of the Project and the employment of labor thereon" prior to making its bid.   (Ex. 1 to

Def.'s MSJ 59A § 1.10,[3] Bidding Requirements and Contract Docs. for Constr. of the Rehab. of the 72-Inch River Interceptor [hereinafter Contract].)  Failure to become fully informed of Project conditions "will not relieve a successful Bidder of the obligation to furnish all material and labor necessary to carry out the provisions of the Contract."  (*Id.*)  In addition, the Contract advises bidders to examine the Project site and be fully informed of its conditions: "Failure to examine the site will not relieve the successful Bidder of an obligation to furnish all products and labor necessary to carry out the provisions of the Contract."  (*Id.* at 59B § 1.10(B).)

The Contract contains a section entitled "Changes in the Contract," which provides, in pertinent part,

> [Defendant] may at any time, as the need arises, order changes within the scope of the Work without invalidating the Contract Agreement.  If such changes increase or decrease the amount due under the Contract Documents, or in the time required for performance of the Work, an equitable adjustment will be authorized by Change Order.
>
> * * *
>
> Should [Plaintiff] encounter, or [Defendant] discover, during the progress of the Work, subsurface or latent conditions at the site materially differing from those

---

[3]Defendant submitted an unnumbered copy of the Contract binder, which contains more than 200 pages.  Defendant refers the Court to tabs it placed in the Contract.  Plaintiff does not reference the tab numbers in its citations to the Contract; rather, Plaintiff points the Court to section and article numbers to the extent possible.  For the sake of clarity, the Court has numbered its copy of the Contract binder, starting with the cover page and including blank pages.  Double-sided pages are numbered ##A and ##B.  In this Order, any citation to the Contract is to the page number within the document.  The Court suggests that the parties confer prior to trial to establish a uniform numbering scheme for those portions of the Contract binder which the parties intend to use at trial.

shown on the Drawings or indicated in the Specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inherent in Work of the character provided for in the Drawings and Specifications, [Defendant] shall immediately be notified in writing of such conditions before they are disturbed. [Defendant] will thereupon promptly investigate the conditions. If [Defendant] finds that conditions do so materially differ, or are of an unusual nature, and upon written request of [Plaintiff], an equitable adjustment will be authorized by Change Order.

If [Plaintiff] does not immediately notify [Defendant] in writing of the belief that a field order, additional work by other contractors or [Defendant], or subsurface, latent or unusual unknown conditions entitles [Plaintiff] to a Change Order, no consideration for time or money will be given [Plaintiff].

[Defendant] may, with [Plaintiff's] concurrence, elect to postpone the issuance of a Change Order until such time that a single Change Order of substantial importance can be issued incorporating several changes.  In such cases, [Defendant] will indicate this intent for each change in the Contract in a written response to [Plaintiff's] request for a change, following agreement by [Defendant] and [Plaintiff] on the change's scope, price and time.

(*Id.* at 112A-112B art. 28.)

According to Plaintiff, Defendant noted during a pre-construction meeting that the Project duration was relatively short and that additions or changes would be accumulated as the Project progressed and be put into one Change Order at the end of the Project. (Willett Aff. ¶ 76, Apr. 21, 2009.)  Defendant admits that it approved a final Change Order that included three items that were not contemplated in the Contract and which Defendant considered to be "extra" work.  (Davis Aff. ¶ 3, May 14, 2009.)  In its reply brief, Defendant appears to represent that it "directed" or "specifically

7

requested" Plaintiff to do all of the work that was ultimately approved in the final Change Order. (Def.'s Reply at 5.)  In support of this proposition, Defendant cites the affidavit of its employee, Steven Davis, but the Davis affidavit does not support Defendant's apparent suggestion that Defendant required strict compliance with the Contract as to the work approved in the final Change Order, such as the requirement that Defendant give prior written approval for changes.  Though Davis states that some of the work approved in the final Change Order was specifically requested by Defendant, he also states that some of the work was "not contemplated in the Contract." Davis does not mention in the affidavit whether Plaintiff obtained Defendant's approval before doing the extra work. (Davis Aff. ¶ 3.) Plaintiff pointed the Court to evidence that Defendant did *not* require prior written authorization for some work it approved in the final Change Order, such as the additional manhole repair. (Willett Aff. ¶ 68 (noting that repair was approved after it was completed).)

## 2.  Bypass Pumping

The Project contemplated rehabilitating the 72-inch river interceptor by installing a cured-in-place pipe liner ("CIPP").  To install the CIPP, Plaintiff had to temporarily reroute—or bypass—the flow that normally went through the interceptor around the interceptor and into the treatment facility.  The Contract contains the following performance requirements related to the bypass pumping portion of the Project:

8

It is [Plaintiff's] sole responsibility to assure that no *sanitary sewer overflow* occurs due to the construction of this project. (Contract at 4 § 01010(G)(emphasis added).)

It is essential to operation of existing sewerage system that there be no interruption in flow of sewage throughout duration of Project.  (*Id.* at 21 § 01531-1.03.)

[Plaintiff shall p]rovide, maintain and operate temporary facilities such as dams, plugs, pumping equipment conduits, and necessary power to intercept sewage flow before it reaches point where it would interfere with the Work. (*Id.*)

[Plaintiff shall m]aintain sewer flow around Work area in a manner that will not cause surcharging of sewers, damage to sewers, and that will protect public and private property from damage.  (*Id.*)

[Plaintiff shall t]ake all necessary precautions to ensure no private or public properties are subjected to a sewage backup or spill. [Plaintiff] shall be solely responsible for all cleanup, damages and resultant fines in the event of a backup or spill.  (*Id.* at 23 § 01531-3.01(C).)

[Plaintiff shall p]rovide adequate capacity and size to handle existing flows plus additional flows that may occur during periods of rainstorm.  Estimate peak amount of flow to be bypassed and provide bypass flow capacity of at least 125 percent of peak flow estimate.  (*Id.* at 22 § 01531-2.01(A).)

If flow reaches peak estimated flow that flow control system was designed for, [Plaintiff shall] stop all Work that requires flow control, secure work area, and restore flow in sewer until flow recedes. (*Id.* at 23 § 01531-3.01(F).)

[Plaintiff shall d]esign, furnish, install, and maintain all power, primary and standby pumps, appurtenances, tanks and trucks, and bypass piping required to maintain existing flows and services.  (*Id.* at 24 § 01531-3.03(B).)

[Plaintiff shall d]ivert sanitary sewage and nonstorm waste flow interfering with construction and requiring diversion to sanitary sewers. [Plaintiff shall] not cause or permit action to occur which would cause an overflow to existing waterway.  (*Id.* at 155B § 01500-3.03(A)(1); *see also id.* at 190 § 02520-3.03(A).)

9

When Plaintiff was preparing its bid for the Project, it asked several companies, including Sunbelt Rentals, Inc. ("Sunbelt") for a quote on the bypass pumping portion of the project.  To prepare its quote, Sunbelt representatives visited the Project site to inspect the lines to be bypassed so they could determine the pipe's material, the type of material flowing in the pipe, the velocity of the flow, the slope of the pipe, the amount of flow in the pipe, and whether there was any evidence of sewage overflows or other sewer system problems.  (Gould Aff. ¶ 7, Apr. 23, 2009.)  One purpose of the inspection was to estimate the average volume and velocity of the flow running through the pipes to be bypassed in order to determine the peak daily flow[4] to be bypassed.  (*Id.* ¶ 11.)  During the site visit, Sunbelt's representatives observed "dry weather flow," which means—in the context of a sanitary sewer—that the flow consists of mainly sewage and waste with no stormwater or groundwater.  (*Id.* ¶ 8.)  Although a sanitary sewer line is generally expected to have some infiltration of stormwater or groundwater during a rainstorm, the amount of infiltration generally expected is nominal.  (*Id.*)  Stormwater and groundwater are not intentionally admitted into a

---

[4]The Contract required that the temporary bypass system provide bypass flow capacity of "125 percent of peak flow estimate."  (Contract at 22 § 01531-2.01(A).)  The Contract does not define "peak flow," but in the industry that term means "the maximum quantity flowing through a line which typically occurs over a short period of time[.]"  (Gould Aff. ¶ 15.)  "Peak flow" is not the same as "maximum flow," which is the maximum capacity a pipe can accommodate without overflowing.  (*Id.* ¶ 16.)

sanitary sewer line. (*Id.* ¶ 10.)  In contrast, a combined sewer is intended to receive both wastewater and stormwater. (*Id.*)

Based on the site inspection, Sunbelt representatives concluded that the lines that needed to be bypassed ran along the Columbus River Walk. (*Id.* ¶ 9.)  Sunbelt representatives calculated the likely flow velocity of the lines to be bypassed and determined that Sunbelt would need to bypass approximately 53 million gallons per day ("mgd") total on three smaller sanitary sewer lines[5] that flowed into the 72-inch interceptor. (Willett Aff. ¶¶ 9, 11.)  These three lines were the 54" Upper Bull Creek Line (24 mgd), the 36" Upper Bull Creek Line (5 mgd), and the 54" Lower River Walk Line (24 mgd).  Sunbelt's bypass calculations were based on "dry weather flows," meaning that the estimated flow calculations did not take into account stormwater or groundwater infiltration. (Gould Aff. ¶ 13.)  Another company, Rain for Rent Atlanta, calculated that the bypass system would need to handle a flow capacity of approximately 60 mgd. (Willett Aff. ¶ 10.)

After Plaintiff was awarded the Project, Plaintiff requested a "'not to exceed' turnkey price" quote from subcontractors for the bypass pumping portion of the Project. (Ex. 14 to Def.'s MSJ, Letter from Mel Willett to Eric Eaton & Ladd Gould, Nov. 15, 2005.)  In the

---

[5]Plaintiff and Sunbelt concluded that the lines to be bypassed were dedicated sanitary sewer lines based on their inspection of the lines and on the Contract, which states, among other things, that the bypass system should "[d]ivert sanitary sewage and nonstorm waste flow interfering with construction and requiring diversion to sanitary sewers." (Contract at 155B § 01500-3.03(A)(1); *see also id.* at 190 § 02520-3.03(A).)

11

quote request, Plaintiff provided the potential subcontractors with a copy of the bypass specifications, contract drawings, and a proposed schedule. (*Id.*) Sunbelt, which was ultimately awarded the bypass pumping subcontract, reviewed the specifications and determined that the Contract required a temporary bypass that could manage an estimated peak flow on a gravity based sanitary sewer line. (Gould Aff. ¶ 15.)

Sunbelt representatives contacted Defendant to ask if there were any particular flow issues on the lines to be bypassed. The sanitary sewer system upstream of the area to be bypassed was many miles long, and most of the lines were buried and problems were not readily discernable, so Sunbelt wanted to find out if the system was subject to unusual infiltration of stormwater or groundwater that might affect downstream flow. (*Id.* ¶ 19.) Sunbelt's representatives spoke with Defendant's chief engineer, Billy Cobb.  Cobb told Sunbelt that he wanted the temporary bypass to manage maximum flow on the 54" Upper Bull Creek Line, which Cobb agreed was 45 mgd, and to manage 5 mgd on the 36" Upper Bull Creek Line, which Cobb said was a somewhat dormant line. (*Id.* ¶ 20.) Cobb also told Sunbelt that the 54" Lower River Walk Line's flow could increase substantially during rain storms but that during the Project a surcharge of the 54" Lower River Walk Line could be discharged by Defendant's combined sewer overflow plant. (*Id.* ¶ 21.) Based on Cobb's input, Sunbelt submitted for approval its plan to develop a bypass system with bypass pumping

12

capacity of 50 mgd for the two Upper Bull Creek Lines and 20 mgd for the Lower River Walk Line.  (*Id.* ¶ 23.)

The parties had a pre-construction meeting to discuss several of Defendant's bypass pumping requirements, including the requirement that the bypass pumping system "be sized and operated such that no overflows occur."  (Ex. 8 to Def.'s MSJ § II(1)(b), Mem. from Mike Stickley to Meeting Attendees, Dec. 20, 2005 [hereinafter Dec. 20 Stickley Mem.].)  The parties also discussed specifics regarding bypass pumping capacity.  (*Id.* § II(1).)  Cobb told Sunbelt to increase pumping capacity on the Lower River Walk Line from 20 mgd to 25 mgd.  (Gould Aff. ¶¶ 24-25.)  Cobb also reiterated his previous statements that (1) Sunbelt should meet maximum capacity, with redundancy, on the 54″ Upper Bull Creek Line for a total of 45 mgd, (2) 5 mgd was adequate for the 36″ Upper Bull Creek Line, and (3) the combined sewer overflow plant would handle any surcharge of the 54″ Lower River Walk Line in wet weather.  (*Id.* ¶ 25.)  Sunbelt incorporated the changes, and the bypass pumping plan was approved. (*Id.* ¶ 29.)

The bypass was up and running on February 8, 2006.  On February 10, 2006, there was a sewage spill from a section of the 36″ Upper Bull Creek Line upstream of the bypass area.  Plaintiff restored flow to the pipes, and Sunbelt investigated the spill and found that the 36″ Upper Bull Creek Line was "severely deteriorated" and had "numerous and massive holes," which meant that the line was subject

to excessive stormwater and groundwater infiltration. (*Id.* ¶¶ 31-32.) Sunbelt also discovered that the flow to the 36" Upper Bull Creek Line entered from a 24" connector from the 54" Upper Bull Creek Line that appeared to be designed as an overflow outlet from the 54" Upper Bull Creek Line but was not in the Project specifications and was not disclosed to Sunbelt or Plaintiff during any of the Project meetings. (*Id.* ¶ 35.) According to Sunbelt and Plaintiff, the existence of the 24" Connector and the problems with the 36" Upper Bull Creek Line were not reasonably discernable by Sunbelt and Plaintiff, and Sunbelt would have designed the bypass system differently—and quoted a higher price—if these issues had been disclosed. (*Id.* ¶¶ 32, 35-36.) Plaintiff and Sunbelt attempted to manage the problems by plugging the 24" connector and putting extra pumps on the 54" Upper Bull Creek Line to handle a surcharge in rain events. (*Id.* ¶ 36.)

Between February 22, 2006 and February 25, 2006, there was heavy rainfall, including 2.3 inches of rain on February 25. (*Id.* ¶ 38.) The 54" Upper Bull Creek Line started to overflow. Sunbelt installed an additional pump but could not contain the water. (*Id.*) Sunbelt suggested that Plaintiff pull the 24" connector plug and use pumps on the 36" Upper Bull Creek Line to handle some of the flow, and Plaintiff did. (*Id.*) On February 27, 2006, both of the Upper Bull Creek Lines overflowed upstream from the bypass work area, despite the fact that all the bypass pumps were running at full capacity.

14

(*Id.* ¶ 40.)  According to Plaintiff and Sunbelt, the amount of flow was not normal for a dedicated sanitary sewer line, even in severe weather, and neither Sunbelt nor Plaintiff could have reasonably foreseen—absent additional information from Defendant[6]—that a rain event, even a large one, would impact the volume and velocity of the flow in the sewer lines to such a large extent.  (*Id.*)

Representatives of Plaintiff and Sunbelt held an emergency meeting with Defendant's representatives Cobb, Steve Davis, and Howard Shiver, as well as representatives of Defendant's engineering manager.  Cobb opined that the bypass was not handling the 50 mgd flow as required by the Contract.  (Miles Aff. ¶ 12, Apr. 22, 2009.) Cobb told Plaintiff to "pull the plug" and restore flow to the sewer. (*Id.*)  Since pulling the plug would have delayed the Project, Sunbelt suggested that more pumping equipment be brought in as an alternative to pulling the plug.  (*Id.*)  The parties conferred further, and Plaintiff requested a written authorization to pull the plug, which Davis and Cobb would not provide.  (Willett Aff. ¶ 57.)  Nonetheless, Plaintiff decided to pull the plug on the 36" Upper Bull Creek Line and told Davis about the decision.  (*Id.* ¶ 60.)  Davis told Plaintiff to add more pumping equipment instead of pulling the plug and also told Plaintiff that they would reevaluate the situation the next day.

---

[6]According to Sunbelt, Defendant knew but did not tell Plaintiff or Sunbelt that the 54" Upper Bull Creek Line ran at almost full capacity—40.33 mgd—during peak dry weather, that the line surcharged during significant rain events, and that the line was subject to overflows; despite this knowledge, Defendant's representatives approved the bypass system designed to handle 45 mgd.  (Gould Aff. ¶¶ 50-54.)

15

(*Id.*)   Cobb gave Sunbelt twenty-four hours to stop the overflow and told Sunbelt to bring in extra equipment if necessary.   (Gould Aff. ¶ 42.)   Sunbelt added the additional pumping equipment, and the flow was under control the next day.   (Willett Aff. ¶ 61.)   Defendant's representative Shiver ordered Plaintiff to keep the extra pumping equipment onsite until the end of the Project in case of another rain storm.   (*Id.* ¶ 62.)   After the flow was under control, Sunbelt ran a test on the equipment it had in place at the time of the overflow and determined that the equipment "could handle, and was handling, well over 50 mgd[.]" (Gould Aff. ¶ 45.)

On March 10, 2006, there was another large rainfall, and there were spills on the Upper Bull Creek Lines.   (*Id.* ¶ 46.)   Sunbelt checked all the pumps, and they were functioning properly.   (*Id.*)   In addition to the problem on the Upper Bull Creek Lines, there was an overflow between the bypass discharge location and the water treatment plant.   (*Id.* ¶¶ 46-48.)   After the March 10 overflows, Defendant's engineering manager told Plaintiff that no further overflows would be tolerated and that Plaintiff should remove the pipe plugs if necessary to prevent another overflow.   (Ex. 4 to Def.'s MSJ, Letter from Stickley to Willett, Mar. 14, 2006.)

16

**3.   Access Road**

The Contract stated that several access roads were available to the Project site, that Plaintiff was responsible for arranging the route to access the site, and that Plaintiff was responsible for restoring routes to their original condition after completion of the work.  (Contract at 156A § 01500-3.04.)  The Contract also provided that Plaintiff had a duty to locate and mark existing utilities. (*Id.* at 139A § 01010-1.05(B).)  The parties agreed that Plaintiff would install the 1,250-foot long CIPP in "one pull" rather than in multiple smaller sections.  (Willett Aff. ¶ 35.)  The CIPP had to be delivered on an oversized trailer and lifted off the trailer and lowered onto the work site by a crane.  (*Id.*)  According to Plaintiff, not all public streets can handle the weight and size of such a load.  (*Id.*)  The parties discussed this issue during the pre-construction meetings and settled on a desirable access point.  (*Id.* ¶ 36.)  However, when Plaintiff started cutting the road, Plaintiff discovered a high voltage power line that was not directly on the Project site but which traversed the road site.  (*Id.*)  According to Plaintiff, the line was not marked on any of the site plans or maps available to Plaintiff.  (*Id.*)  Because of the power line, Plaintiff had to find another access point and get Defendant to approve it. Plaintiff claims that there was only one appropriate access site—not several as the Contract stated.  (*Id.* ¶ 37.)  Plaintiff developed a plan to use that site and anticipated an increased cost of $25,000.

17

Plaintiff also offered to waive most of the increased cost of the access road if Defendant would close the River Walk during the Project, though Plaintiff's offer did contemplate offsetting some of the increased access road costs against the savings that would be generated by the River Walk closure. (*Id.* ¶ 41.)  According to Plaintiff, Defendant's representatives initially agreed to the proposal. (*Id.*)  However, Defendant did not close the River Walk, so Plaintiff did not consider its claim for the increased cost of the access road to be waived. (*Id.* ¶ 88.)  When Plaintiff actually built the access road, the costs far exceeded $25,000 because Plaintiff had to build the road across a public park with a baseball field and a pool—Plaintiff had to tear up (and then repair) the ball field, a fence, and some pavement around the pool. (*Id.* ¶ 89.)

**4.   River Walk Closure**

Under the Contract, the River Walk was to remain open. (*E.g.*, Contract at 138B § 01010-1.03(C)(9).)  Plaintiff and Defendant had two pre-construction meetings on the Project.  During both meetings, Plaintiff's representative asked Defendant to close the Columbus River Walk during the Project because of safety risks to the public. (Ex. 16 to Pl.'s Resp. § XIII(3), Mem. from Chip Johnson to Bill Adams, *et al.*, Dec. 8, 2005 [hereinafter Dec. 8 Johnson Mem.]; Dec. 20 Stickley Mem. § II(1)(a).)  During both meetings, Defendant emphasized that the River Walk "must remain in service at all times." (Dec. 20 Stickley Mem. § II(1)(a); *see also id.* § II(2); Dec. 8

18

Johnson Mem. § XIII(3).)   During the second meeting, which was attended by representatives of Plaintiff, Defendant, and Sunbelt, Defendant's representative told Plaintiff that to have Defendant consider Plaintiff's request to close the River Walk, Plaintiff would have to submit a written Request for Information ("RFI"), including drawings, detailing why the River Walk could not remain open.  (Dec. 20 Stickley Mem. § II(2).)   Plaintiff submitted an RFI requesting closure of the River Walk on December 23, 2005.  (Willett Aff. ¶ 33.) Defendant's project engineer recommended that Plaintiff delay mobilization on the Project until the RFI was approved.  (*Id.* ¶ 31.) The parties discussed the River Walk closure—including a schedule and advertising of the closure—and Defendant drafted a proposed change order proposing a reduction of the contract price for time saved by closure of the River Walk.  (*Id.* ¶¶ 38-42.)   Based on the proposed change order and communications between Plaintiff and Defendant during January, Plaintiff's representatives believed that the River Walk would be closed from January 23 to March 13, 2006, and Plaintiff ordered closure notice signs to be put up at various access locations.  (*Id.* ¶¶ 43, 47.)

However, Defendant decided on January 19, 2006 to keep the River Walk open and asked Plaintiff to submit new plans accordingly.  (*Id.* ¶ 44.)  Plaintiff was ready to set up the bypass pumping that day but could not do so until Defendant approved the plan to keep the River Walk open.  (*Id.* ¶ 48.)  Plaintiff re-submitted its previous plans to

keep the River Walk open on January 20, 2006, and Defendant took ten days to approve the plans. (*Id.* ¶ 45.) On January 30, 2006, Plaintiff was instructed that it could not begin work until Defendant received a site disturbance permit, which the parties had agreed Defendant was responsible for getting. (*Id.* ¶¶ 18, 46.) Defendant received the permit (which had been issued on January 19, 2006) later that day. (*Id.* ¶ 46.) Plaintiff claims that if Defendant had approved Plaintiff's River Walk plan which had previously been submitted, it could have mobilized on the Project on January 19 or 20 instead of January 30. Plaintiff also contends that Defendant's "vacillation" on the River Walk cost Plaintiff twenty-eight "additional days of extended onsite overhead and other direct and indirect costs incurred from being on site that additional time"—presumably because Plaintiff could have started the Project on January 2, 2006 had there been no debate regarding closure of the River Walk. (Pl.'s Resp. 18.)

Under the Contract, no adjustment of Contract time or price would be allowed due to delays because of the project engineer's review of Plaintiff's submittals unless (1) Plaintiff notified the engineer in writing that a timely review of the submittal was critical to progress of the work, (2) the engineer failed to review and return Plaintiff's submittal within thirty days or an agreed upon time, and (3) Plaintiff shows that the delay in progress was directly

attributable to the engineer's failure to return the submittal within the required time.  (Contract at 145B § 01300-1.01(H).)

**5.   Plaintiff's Claims**

As to the items of work for which Plaintiff seeks additional compensation, Plaintiff brings alternative claims for breach of contract (Compl. ¶¶ 15-21), quantum meruit/quantum valebant (*id.* ¶¶ 22-27), unjust enrichment (*id.* ¶¶ 28-33), open account for goods and services sold and delivered (*id.* ¶¶ 34-40), and a claim under Georgia's Prompt Pay Act (*id.* ¶¶ 46-49).  Defendant argues that all of Plaintiff's claims as to claims 7-9 are barred because the work was clearly required by the Contract.

DISCUSSION

Defendant contends that summary judgment is warranted as to claims 7-9 because Plaintiff seeks additional compensation for work that was already required under the Contract.  Defendant also argues that even if the claimed work was "additional," Plaintiff waived its claim as to that work because it did not obtain prior written approval for the changes as required under the Contract.  Plaintiff asserts that several of the Contract's terms are ambiguous, that extrinsic evidence is admissible to explain the intent of the parties, and that genuine issues of material fact exist as to whether the claimed work was "additional."

21

## I.    Contract Construction Under Georgia Law

Contract construction "is a question of law for the court based on the intent of the parties as set forth in the contract." *McGuire Holdings, LLLP v. TSQ Partners, LLC*, 290 Ga. App. 595, 602, 660 S.E.2d 397, 403 (2008) (internal quotation marks omitted).   There is a three-step process for construing a contract.   First, the Court must decide "whether the contract language is clear and unambiguous; if so, the court simply enforces the agreement according to its terms." *Id.*   If the Court determines that the language is ambiguous, "it must then apply the applicable rules of contract construction" found in O.C.G.A. § 13-2-2.   *Id.*; *accord Gen. Steel, Inc. v. Delta Bldg. Sys., Inc.*, 297 Ga. App. 136, 138-39, 676 S.E.2d 451, 453-54 (2009).   "If after doing so the ambiguity still remains, the jury or other factfinder must resolve the ambiguity." *McGuire Holdings, LLLP*, 290 Ga. App. at 602, 660 S.E.2d at 403.

> Ambiguity exists where the words used in the contract leave the intent of the parties in question-i.e., that intent is uncertain, unclear, or is open to various interpretations. Conversely, no ambiguity exists where, examining the contract as a whole and affording the words used therein their plain and ordinary meaning, the contract is capable of only one reasonable interpretation.

*Gen. Steel, Inc.*, 297 Ga. App. at 138, 676 S.E.2d at 453-54.   Though parol evidence is not admissible to contradict or construe an unambiguous contract, it is admissible when an ambiguity cannot be resolved through the rules of contract construction and the ambiguity must be resolved by a factfinder.   *See* O.C.G.A. § 13-2-2(1).

22

## II.  Bypass Pumping System Claims

Defendant argues that all of Plaintiff's claims related to the additional bypass pumping are barred because (1) Plaintiff had a clear contractual duty to design a bypass pumping system to ensure no interruption of flow and prevent any overflow of sewage, (2) the Contract instructed Plaintiff to design its bypass pumping system to take potential rainstorms into account, and (3) the Contract instructed Plaintiff to stop all work and restore flow in the 72-inch river interceptor in the event of an overflow.  Defendant suggests that Plaintiff's bypass pumping system was not adequate to meet the contractual requirements and that this inadequacy—not anything else—caused Plaintiff to order the extra bypass pumping equipment. (Def.'s MSJ Br. at 9.)

The Contract provides that Plaintiff must assure no "sanitary sewer overflow" due to the Project and that Plaintiff must divert "sanitary sewage and nonstorm waste flow interfering with construction and requiring diversion to sanitary sewers." (Contract at 4 § 01010(G); *id.* at 155B § 01500-3.03(A)(1); *see also id.* at 190 § 02520-3.03(A).)  The Contract also provides that Plaintiff must provide "adequate" bypass capacity to "handle existing flows plus additional flows that may occur during periods of rainstorm." (*Id.* at 22 § 01531-2.01(A).)  Specifically, the Contract provides that Plaintiff must provide "bypass flow capacity of at least 125 percent of peak flow estimate."  (*Id.*)

23

The Contract does not define "adequate bypass capacity," "peak flow," or "existing flow."   The Contract also does not define "sanitary sewer line." Defendant's position appears to be that Plaintiff was required to design a bypass system with adequate capacity to handle maximum (not merely peak) flow regardless of whether the existing flow was only sanitary sewage and nonstorm waste flow or included stormwater and ground water.   Plaintiff contends, however, that the Contract specified that the lines to be bypassed were sanitary sewer lines and that the Contract thus only required Plaintiff to handle "peak flow" of sanitary sewage and nonstorm waste flow, taking into account nominal stormwater infiltration during rainy weather.   The Court finds that the Contract is ambiguous as to the nature of the lines to be bypassed and the required capacity of the bypass, and the meaning of these terms cannot be completely resolved by applying Georgia's rules of contract construction. Therefore, Plaintiff may present extrinsic evidence regarding the meaning of these terms.[7]

Plaintiff also contends that even if the Contract required Plaintiff to handle maximum flow of the lines to be bypassed from any source as Defendant suggests, Plaintiff is still entitled to an equitable adjustment under the Contract because the significant

---

[7]Plaintiff presented evidence that in the industry a sanitary sewer line contains only sewage flow and does not intentionally admit stormwater and groundwater, although nominal infiltration of stormwater and groundwater is expected during a rainstorm.   (Gould. Aff. ¶¶ 8, 10.) Plaintiff also showed that the Contract and Defendant's representatives stated that the lines to be bypassed were sanitary sewer lines.

infiltration of stormwater in the sanitary sewer lines upstream from the Project site—which were mostly underground—was a subsurface or latent condition materially differing from the conditions indicated in the specifications and was an unknown condition differing materially from those ordinarily encountered and generally recognized as inherent in work.  In other words, Plaintiff contends that it had an adequate pumping system for the lines as they were specified by the Contract and by Defendant, but additional equipment was necessary to provide pumping capacity for the increased flow due to subsurface or latent conditions materially differing from the Contract specifications.

The Contract specifically contemplated that Defendant bore the risk of materially differing site conditions.  (Contract at 112B art. 28.)  The Court agrees with Plaintiff that genuine issues of material fact exist as to whether there were materially differing site conditions.  There is evidence that Defendant—which had superior knowledge of its own system—approved of the bypass system design, suggesting that it was adequate to meet the Contract requirements. Furthermore, there is evidence that Defendant's system had extensive stormwater/groundwater infiltration not normally encountered in a dedicated sanitary sewer line, and there is also evidence that Defendant did not provide several crucial pieces of information regarding its system and the lines to be bypassed—information that was not readily discernable from the site inspection and that would have impacted Plaintiff's and Sunbelt's assumptions regarding the

required flow capacity and changed the scope of the bypass system design.

Defendant also appears to argue that even if there were materially differing site conditions that led to the overflows (and the need for additional pumping equipment), the Contract clearly obligated Plaintiff to "pull the plug" instead of adding more bypass equipment in the event of an overflow.  However, Plaintiff has pointed to evidence that Defendant's representatives waived this requirement by instructing Plaintiff to install additional pumping equipment (rather than "pull the plug") and to keep it on site for the duration of the Project.

Defendant also contends that even if the additional bypass pumping equipment was required because of differing site conditions and was not required under the Contract, Plaintiff's claim for additional compensation fails because Plaintiff did not follow the Contract's specific process for approval of any work that changed the price of the Contract.  Under Georgia law, however, there may be a waiver of a contractual provision requiring a written change order where the parties "by a course of conduct have departed from the terms of the contract and operated without prior written change orders[.]" *Consol. Fed. Corp. v. Cain*, 195 Ga. App. 671, 672, 394 S.E.2d 605, 606-07 (1990) (internal quotation marks omitted). Viewing the evidence in the light most favorable to Plaintiff as the Court must do at this stage in the litigation, a reasonable juror

26

could conclude that Defendant waived the contractual requirement for Plaintiff to seek a Change Order for additional work because there is evidence that (1) the parties agreed that additions or changes would be accumulated and put into one Change Order at the end of the Project, and (2) Defendant approved several of Plaintiff's claims for additional compensation in a final Change Order despite a lack of prior written approval for the claims.

For all of these reasons, the Court concludes that a trial is necessary to determine whether or not the additional bypass work was within the scope of the Contract or resulted from differing site conditions and whether Defendant waived the Contract's prior written Change Order requirement.[8]

## III. Access Road

Under the clear terms of the Contract, Plaintiff had responsibility to arrange site access.  Plaintiff contends, however, that the actual site conditions differed materially from those in the specifications and drawings because an off-site high voltage power line traversed a potential access point and rendered that site unusable.  Plaintiff also contends that because of the nature of the

---

[8]Defendant's Motion for Summary Judgment is based upon Defendant's theory that the additional bypass equipment was not "extra" under the Contract.  In other words, Defendant argued that Plaintiff could not recover under the Contract and could not recover under quantum meruit and unjust enrichment theories because the Contract governs the action and does not allow Plaintiff to recover for the additional work.  Defendant does not make additional arguments specific to the merits of Plaintiff's alternative theories of quantum meruit and unjust enrichment, and the Court concludes that it need not address these issues at this time.

materials to be delivered to the Project site there was only one acceptable access point—not several as the Contract specified. The Court disagrees. There is no evidence that the Contract required a heavy duty access road like the one Plaintiff chose to build: the Contract did not require that Plaintiff bring the CIPP in "one pull," and there is no evidence that the *only* way to deliver the materials to the Project site was to have a heavy duty road capable of handling a large crane or the CIPP in "one pull." There is also no evidence that Defendant knew about the high voltage power line but failed to tell Plaintiff about it. Finally, it is undisputed that the high voltage power line was not on the Project site but was on an adjacent piece of property. The Contract placed responsibility on Plaintiff to arrange site access and to locate and mark existing utilities. The Contract does not contemplate allocating to Defendant the risks related to Plaintiff's chosen method for delivering the Project equipment—particularly since there is no evidence that Plaintiff's chosen delivery method was the only available method. For all of these reasons, the Court concludes that the Contract terms related to the access road are clear and unambiguous and that under these terms Plaintiff is not entitled to additional compensation for increased costs of the access road.

**IV.   River Walk Closure Decision Delays**

The Contract unambiguously provides that time or price adjustments would not be allowed due to delays because of the project

engineer's review of Plaintiff's submittals unless the engineer failed to review and return the submittal within the required time and the delay in progress was directly attributable to that failure. (Contract at 145B § 01300-1.01(H).)  Plaintiff points to no evidence that this provision does not apply to Plaintiff's delay claims. Plaintiff essentially contends that Defendant delayed the Project start date because Defendant did not consider alternative plans to keep the River Walk open while it considered Plaintiff's request to close the River Walk.

The Contract clearly requires that the River Walk remain open. (*E.g.*, *id.* at 138B § 01010-1.03(C)(9).)  Defendant reiterated this requirement during two pre-construction meetings in which Plaintiff asked Defendant to close the River Walk during the project.  (Dec. 20 Stickley Mem. § II(1)(a); *see also id.* § II(2); Dec. 8 Johnson Mem. § XIII(3).)  Plaintiff submitted an RFI requesting closure of the River Walk on December 23, 2005.  Defendant considered the RFI and seemed poised to approve it, but Defendant rejected the RFI on January 19, 2006.  Plaintiff has pointed to no evidence that Defendant failed to consider the RFI within an agreed-upon time, and under the unambiguous terms of the Contract this review delay is thus not compensable.  Once Defendant rejected Plaintiff's request to close the River Walk, Plaintiff submitted its plan for keeping the River Walk open during the Project.  Defendant took ten days to review and approve the plan, and Plaintiff has pointed to no evidence

29

that Defendant failed to consider the plan within an agreed-upon time.  Plaintiff also pointed to no evidence that Defendant previously considered or approved Plaintiff's plan for keeping the River Walk open.  For these reasons, under the unambiguous terms of the Contract this review delay is not compensable.  Defendant is therefore entitled to summary judgment on Plaintiff's claim for delay costs related to the decision not to close the Columbus River Walk.

CONCLUSION

As discussed above, Defendant's Motion for Summary Judgment (Doc. 36) is granted as to Plaintiff's claims for additional access road costs and costs associated with delays related to the decision not to close the Columbus River Walk.  Defendant's Motion for Summary Judgment is denied as to all other claims.  Defendant's motions to strike (Docs. 60, 61, 62) are moot.

IT IS SO ORDERED, this 29th day of June, 2009.


S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE